**Mariann HOPKINS, Plaintiff–Appellee,**

v.

**DOW CORNING CORPORATION, Defendant–Appellant.**

No. 92–16132.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 18, 1993.

Decided Aug. 26, 1994.

Shirley M. Hufstedler, Hufstedler, Kaus & Ettinger, Los Angeles, CA, for defendant-appellant.

Laurence H. Tribe, Law Professor, Cambridge, MA, Dan C. Bolton, Wilson, Shryack & Bolton, San Francisco, CA, for plaintiff-appellee.

Before: LAY,[*] HUG, and SCHROEDER, Circuit Judges.

HUG, Circuit Judge:

In this diversity action, Mariann Hopkins sued Dow Corning Corporation to recover for injuries suffered as a result of two sets of breast implants manufactured by Dow, which she received in breast reconstruction surgeries in 1977 and 1986. The jury found Dow liable for Hopkins' injuries and awarded Hopkins $840,000 in compensatory damages and $6.5 million in punitive damages. Dow appeals.

Dow contends that the district court erred in determining that Hopkins' claims were not barred by the applicable statute of limitations. Dow challenges the district court's determination that the evidence presented at trial was sufficient to support a finding of fraud and further challenges the court's decision to admit the plaintiff's expert testimony on the issue of causation. Finally, Dow challenges the amount of both the compensatory and the punitive damages awards.

The district court's jurisdiction was based upon 28 U.S.C. § 1332(a)(1). We exercise jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm.

## I. FACTS

On October 4, 1976, plaintiff Mariann Hopkins underwent a bilateral subcutaneous mastectomy for severe fibrocystic disease at St. Mary's Hospital in San Francisco, California. Dr. Karl Bollinger performed the surgery. During the operation, Dr. Bollinger performed reconstructive surgery on plaintiff's breasts utilizing silicone gel implants manufactured by defendant Dow Corning.

Due to subsequent complications, Dr. Bollinger removed the left implant in November, 1976. In June, 1977, Dr. Bollinger inserted a replacement implant in the left breast and replaced the right breast implant in order to achieve symmetry. These implants were also manufactured by the defendant.

In March, 1979, Dr. Stephen Gospe diagnosed plaintiff with mixed connective tissue disease ("MCTD"). MCTD is a rheumatological disorder which includes symptoms such as extreme fatigue, weakness, muscle aches and pains, arthralgia, myalgia and arthritis. There is no known cure for this disease.

In January, 1986, plaintiff contacted Dr. Bollinger about further complications from her breast implants. Plaintiff underwent surgery in February to correct the problem. At that time, Dr. Bollinger discovered the implants had ruptured; during the four-hour

[*] Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

operation, he proceeded to remove silicone gel that had escaped from the implant. The ruptured implants were sent to Dow for analysis. Several months later, Dow responded to Dr. Bollinger that "examination and testing of both envelopes found no evidence to indicate that any of the damage was manufacture related." Dr. Bollinger informed plaintiff of these results.

None of plaintiff's physicians informed her that the ruptured implant could be responsible for the connective tissue disease from which she suffered. In December, 1987, plaintiff learned from her mother that a possible connection between the ruptured implants and the immune disorder might exist. Shortly thereafter, plaintiff inquired of her physician, Dr. Pelfini, if a possible causal link existed. Dr. Pelfini informed plaintiff that he had never heard of such a connection. In January, 1988, plaintiff visited another of her treating physicians, Dr. Gospe, and inquired the same of him. Dr. Gospe was also unable to provide information regarding a possible causal connection. Plaintiff filed her complaint on December 1, 1988, alleging fraud, strict products liability and breach of express and implied warranties, and requesting compensatory and punitive damages.

The case was bifurcated so that issues regarding liability would be determined first, and if needed, a second trial on damages would be held. The liability phase of the trial began on October 29, 1991. The evidence presented at trial indicated that Dow rushed development of the silicone gel implants, failed to adequately test the implants, and ignored knowledge of adverse health consequences associated with the implants. Plaintiff presented evidence that Dow created a Mammary Task Force charged with getting the new gel implant to market in less than five months. Even after a task force member presented his concerns about "a possible gel bleed situation" Dow ignored proposed design modifications that would reduce the likelihood of leakage. The record indicates that Dow instructed salesmen to wash the implants with "soap and water" in the nearest restroom, and to "dry with hand towels as the implants become oily after be-

ing handled and [bleed] on the velvet in the showcase."

The evidence further indicated that in addition to the evidence of silicone leakage, Dow implants experienced a high rate of rupture. Despite proposals by one task force member to implement a "multiple dip" method as a means of ensuring greater uniformity in the envelope, and thereby less likelihood of rupture, Dow adopted the single dip method because it was "easier" and "cheaper." After an incident in which two of the new gel implants "broke during augmentation surgery for the TV taped demonstrations," Thomas Talcott, a Dow engineer, inquired of key Dow employees, "When will we learn at Dow Corning that making a product 'just good enough' almost always leads to products that are 'not quite good enough?' "

There was also evidence that no research concerning the long-term health effects had been conducted. The longest study to address possible adverse health effects of the implants took place over only 80 days and revealed evidence of inflammatory immune response caused by the gel. Dow continued to market these implants until 1987, without the benefit of a lifetime study to demonstrate the safety of its product.

Other evidence at trial indicated that Dow had knowledge of the harmful effects of silicone on the human body. Dow obtained results of a study in which four dogs received silicone gel implants that resembled the implants that Dow was then marketing. The results demonstrated that after six months, the implants appeared to be functioning properly, but that after two years, inflammation surrounding the implants demonstrated the existence of an immune reaction. Dow did not publicly release the results of this research for several years, and when it did ultimately release the results, Dow omitted the negative findings and implied that the implants were safe.

Based on these facts, the jury returned a special verdict finding the defendant liable on all plaintiff's theories, including strict liability, breach of warranty, and fraud. The second trial, pertaining to the amount of damages, began on December 11, 1991. The jury awarded plaintiff $840,000 in compensatory

**1120**

damages and $6.5 million in punitive damages. The district court denied Dow's motion for a directed verdict. The district court also denied Dow's motions for judgment notwithstanding the verdicts and, alternatively, a new trial. Dow appealed.

## II. STATUTE OF LIMITATIONS

Dow contends that Hopkins' strict liability and breach of warranty claims are barred by California's one-year statute of limitations for personal injury claims. Hopkins asserts that her claims were timely because they were filed pursuant to the "delayed discovery" doctrine.

▐ Hopkins and Dow agree that California Code of Civil Procedure § 340(3), which sets forth a one-year statute of limitations period for "an action ... for injury to ... one caused by the wrongful act or neglect of another," applies to the products liability and breach of warranty theories alleged in this case. The parties also agree that the common law rule, which provides that a cause of action accrues on the date of the injury, applies except as modified by the discovery rule. Under California's discovery rule, the accrual date of a cause of action is delayed until the plaintiff is aware of her injury and its negligent cause. *Jolly v. Eli Lilly & Co.,* 44 Cal.3d 1103, 245 Cal.Rptr. 658, 660–62, 751 P.2d 923, 926–27 (1988); *Frederick v. Calbio Pharmaceuticals,* 89 Cal.App.3d 49, 152 Cal.Rptr. 292, 294 (Ct.App.1979). The parties disagree as to when Hopkins became aware of her injury and its wrongful cause and, thus, whether Hopkins initiated this action in a timely manner.

On cross motions for summary judgment, the district court ruled that Hopkins' suit was timely filed.[1] We review *de novo* the district court's determinations on summary judgment. *Jones v. Union Pac. R.R. Co.,* 968 F.2d 937, 940 (9th Cir.1992); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 629 (9th Cir.1987). We must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Federal Deposit Ins. Corp. v. O'Melveny & Meyers,* 969 F.2d 744, 747 (9th Cir.1992), *cert. granted,* — U.S. —, 114 S.Ct. 543, 126 L.Ed.2d 445 (1993); *Tzung v. State Farm Fire and Casualty Co.,* 873 F.2d 1338, 1339–40 (9th Cir.1989).

Under California's discovery rule, "the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." *Jolly,* 245 Cal.Rptr. at 662, 751 P.2d at 927. Plaintiff need not know the specific facts necessary to establish her claim. *Id.* 245 Cal.Rptr. at 662, 751 P.2d at 928. Once plaintiff has " 'notice or information of circumstances to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to [her] investigation, ... the statute commences to run' " *Braxton–Secret v. A.H. Robins Co.,* 769 F.2d 528, 530 (9th Cir.1985) (citation omitted). To invoke the discovery rule, plaintiff must plead facts which show "(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Saliter v. Pierce Bros. Mortuaries,* 81 Cal.App.3d 292, 146 Cal.Rptr. 271, 274 (Ct.App.1978) (citing *G.D. Searle & Co. v. Superior Court,* 49 Cal.App.3d 22, 122 Cal. Rptr. 218, 220 (Ct.App.1975)).

Hopkins pled the facts necessary to invoke the discovery rule. With respect to the time and manner of her discovery that her injury may have been caused by wrongdoing, Hopkins alleged in her complaint that prior to December 1, 1987, plaintiff never had any reason to suspect that her silicone breast implants were the wrongful cause of her MCTD.

In ruling on the cross motions for summary judgment, the district court granted Hopkins' motion and denied Dow's. Dow appeals both orders. Obviously, if Hopkins' motion was properly granted, Dow's was properly denied. We therefore initially consider the order granting Hopkins' summary judgment.

---

1. In its motion for summary judgment, Dow argued that all of Hopkins' claims, except those based upon fraud and negligent misrepresentation, were time-barred.

A party seeking summary judgment bears the initial burden of informing the district court of the basis for its motion, identifying those portions of its pleadings, depositions, answers to interrogatories, admissions on file or affidavits that demonstrate an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Hopkins concedes that she would have the burden of proof at trial that her discovery of the wrongdoing was within one year from the time she filed her action. Thus, in order to prevail on the motion for summary judgment, she had to show that Dow failed to present evidence sufficient to create a genuine issue of fact as to whether the action was filed within one year of the discovery of the wrongdoing. *See Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The standard for granting a summary judgment is equivalent to the standard for granting a judgment as a matter of law under Fed. R.Civ.P. 50. *Id.* at 323, 106 S.Ct. at 2552.

■ In her deposition, Hopkins testified that she learned of the possible connection between breast implants and autoimmune disease from her mother in December, 1987.[2] Thereafter, Hopkins asked Drs. Pelfini and Gospe about the possible connection. Like Dr. Bollinger's deposition testimony, the deposition testimony of Drs. Pelfini and Gospe shows that neither was aware of or informed her of the link between the implants and her disease. Hopkins also testified that she had never read any news report or other article in any newspaper or magazine about the possible link between breast implants and autoimmune disease. Hopkins filed her com-

plaint on December 1, 1988, within one year of her alleged discovery in December, 1987.

With respect to the circumstances excusing delayed discovery, Hopkins asserted that when she first learned that the implants had ruptured in February, 1986, she had no reason to suspect that the rupture had caused her injury or that any injury was the result of wrongdoing. Hopkins testified that her review of Dow's Complaint Analysis Report convinced her that the implants were "not defective in any way." The report made no mention of medical research indicating a link between silicone and MCTD. Moreover, the report stated, as to both implants, that (1) "[t]he envelope displayed no abnormality in the area of the rupture" and (2) "[t]he thickness [of the implant envelope] is within the product specification limits." The report concluded that "[e]xamination and testing of both envelopes found no evidence to indicate that any of the damage was manufacture related." In response to requested discovery, Dow admitted that the report "does not state that the implants were defective in design" and "does not state that breast implants may rupture without cause following implantation." We conclude that these facts demonstrate Hopkins' time of discovery, and further demonstrate circumstances excusing her delayed discovery.

We must next consider whether Dow set forth specific facts sufficient to demonstrate the existence of a genuine issue of material fact for trial regarding the discovery rule. In reviewing an order granting summary judgment, we are limited to the facts shown in the affidavits, depositions, interrogatories, admissions, uncontested pleadings, and other evidence available to the court at the time the motion was made. *Jewel Companies v. Pay Less Drug Stores Northwest*, 741 F.2d 1555, 1559 (9th Cir.1984).[3]

2. The record does not reflect the circumstances surrounding Hopkins' mother's knowledge of the possible connection between MCTD and the breast implants, nor does the record suggest that Hopkins' mother learned of the connection prior to December, 1987.

3. An order granting summary judgment governs the future course of the trial, with the parties having considered the issue to be settled. This is to be distinguished from an order denying sum-

mary judgment, where the parties anticipate the production of further evidence on the issue of fact and may respond at trial. In that circumstance, the adequacy of the evidence to justify a jury's consideration of the issue is properly considered in the context of a motion for a judgment as a matter of law under Fed.R.Civ.P. 50. *See Stuckey v. Northern Propane Gas Co.*, 874 F.2d 1563, 1567 (11th Cir.1989).

Dow contends that the statute started running in 1986 when Dr. Bollinger discovered the ruptured implants during the February, 1986 surgery, and that Hopkins was responsible for investigating the possibility of wrongdoing at that time. The injury for which Hopkins seeks recovery is the MCTD, which she contends was caused by the defective implants. Dow maintains that Hopkins manifested suspicion of wrongdoing by asking for Dow's laboratory analysis of the returned implants and, therefore, that she was obligated to undertake an investigation into the possibility of wrongdoing. Dow submits that a simple investigation would have revealed to Hopkins the possible connection between the implants and MCTD.

We conclude that Dow failed to set forth specific facts indicating that when Hopkins first learned that the implants had ruptured in February, 1986, Hopkins actually suspected that she had been injured and that her injury was caused by wrongdoing. Dow did not point to any medical or testimonial evidence demonstrating that Hopkins was actually suspicious. Unlike the plaintiff in *Jolly*, Hopkins never stated that "she was interested in 'obtaining more information' about [the implants] because she wanted to 'make a claim;' she felt that someone had done something wrong to her concerning [the implants], that [they were] defective [prostheses] and that she should be compensated." *Jolly*, 245 Cal.Rptr. at 663, 751 P.2d at 929. Hopkins' statements were simple inquiries and not reflective of any suspicion of wrongdoing by Dow.

The statements Hopkins made are contrary to those made in *Jolly* and are readily distinguishable from those made by the plaintiffs in the cases on which Dow relies. *See Miller v. Lakeside Village Condo. Assn.*, 1 Cal.App. 4th 1611, 2 Cal.Rptr.2d 796, 803 (Ct.App.1991) (on summary judgment, plaintiff expressly agreed that it was undisputed that the letter, which her husband sent to defendant almost two years before she filed her complaint, stated that the flooding caused mold which caused her injuries); *Gutierrez v. Mofid*, 39 Cal.3d 892, 218 Cal.Rptr. 313, 315–17, 705 P.2d 886, 888–89 (1985) (the evidence on summary judgment made clear,

and plaintiff conceded for purposes of argument, that she both knew of her injury and suspected malpractice almost immediately after the operation—almost two years before she filed suit); *Snow v. A.H. Robins Co., Inc.*, 165 Cal.App.3d 120, 211 Cal.Rptr. 271, 275 (Ct.App.1985) (plaintiff's deposition testimony demonstrated that eight years prior to filing her complaint, she viewed the Dalkon Shield as responsible for her ultimate injuries); *Sidney–Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 884 (9th Cir.1983) (plaintiff testified at her deposition that she understood immediately after the hysterectomy, more than six years before she filed suit, that the Dalkon Shield had not done what it was supposed to do and that it had caused the infection). There has been no evidence presented that Hopkins ever made statements of this nature. In the absence of specific factual evidence, there can be no triable issue of fact as to whether Hopkins actually knew that she had been injured and that her injury was caused by wrongdoing.

Furthermore, we also conclude that Dow failed to present specific facts to create a genuine issue of material fact as to whether Hopkins should have suspected that she had been injured and that her injury was caused by wrongdoing in February, 1986. Unlike the Dalkon Shield cases cited by Dow, this is not a case in which the only reasonable conclusion that Hopkins could have drawn was that the failure of the medical device to serve its purpose was the possible cause of her injury. *See Braxton–Secret*, 769 F.2d at 531 ("When she discovered, after suffering a miscarriage, that she had been pregnant while the IUD was still in place, the only reasonable conclusion she could have drawn was that the IUD failed its contraceptive purpose" and caused her pregnancy and incomplete spontaneous abortion); *Snow*, 211 Cal. Rptr. at 276 ("An abortion is an event sufficient to alert a victim of unwanted pregnancy while using an IUD 'to the necessity for investigation and pursuit of her remedies.'") (citation omitted).

Hopkins' case is drastically different from the Dalkon Shield cases discussed above. It is widely known that an intrauterine device, like any contraceptive, is designed to prevent

pregnancy. Further, it is commonly understood that there is a direct connection between contraceptives and pregnancy. In contrast, the purpose of breast implants is not to prevent autoimmune disease, and it is not commonly understood that there is any connection, let alone a direct connection, between breast implants and MCTD. The Dalkon Shield cases are simply inapposite.

Dow contends that if Hopkins had undertaken a simple investigation, she would have discovered the possible link between breast implants and MCTD. We reject this contention. Hopkins' review of Dow's Complaint Analysis Report certainly did not reveal to her the possible connection; the report made no mention of medical research indicating a link between silicone and autoimmune diseases. Further, Hopkins, a lay person, was unlikely to discover the single article from a professional medical journal[4] and two cases like Hopkins' case against Dow, which Dow identified in its moving papers. Unlike *Jolly*, this is not a case in which "a timely investigation would have disclosed numerous articles concerning [the possible link between breast implants and autoimmune disease] [in lay publications] and many [breast implants] suits filed throughout the country alleging wrongdoing." *Jolly*, 245 Cal.Rptr. at 663, 751 P.2d at 929. As the district court accurately observed, the article and lawsuits cited by Dow were neither numerous nor notorious enough to put Hopkins on notice about her injury.

Any information that a "simple investigation" arguably would have revealed to Hopkins should have come from Dow itself. In responses to requests for admissions, Dow stated that there were "reports in the published medical literature of suspected immunological sensitization or hyperimmune system response to silicone mammary implants" as of May, 1986. However, Dow neglected to mention this association in its Complaint Analysis Report so that Hopkins could take appropriate action. Instead, Dow elected to suppress this information. A simple investigation would not have revealed the existence of this information, and none of Hopkins' physicians answered her questions with any information suggesting that such a link existed. We agree with the district court that "the Complaint Analysis Report issued by Dow encouraged, if not created, plaintiff's belief that defendant's product was not defective and that she was not injured" such that "[r]uling in defendant's favor here would therefore unjustly reward defendant for misleading consumers such as Ms. Hopkins." We conclude that any effort by Hopkins to determine whether there was wrongdoing or whether there existed a possible link between breast implants and autoimmune disease were hampered by Dow, and that Hopkins' eventual discovery was made in spite of Dow.

The uncontradicted facts presented in support of the motions for summary judgment demonstrate that prior to December, 1987, Hopkins neither suspected nor should have suspected that she had been injured or that any injury was caused by wrongdoing. Accordingly, we conclude that the applicable statute of limitations was tolled until Hopkins' discovery in December, 1987, and the district court's order granting summary judgment in favor of Hopkins on this question was proper.

### III. *ADMISSIBILITY OF EXPERT WITNESS TESTIMONY*

Dow argues that the district court erred in denying Dow's motion in limine attacking the admissibility of the testimony of Hopkins' three expert witnesses. Dow maintains that the testimony on the issue of causation should have been excluded because it was not based on scientifically accepted standards. Further, Dow asserts that without the expert testimony, Hopkins would have been unable to satisfy her burden of proving that the implants caused her injuries. We review a district court's evidentiary rulings for abuse of discretion. *Roberts v. College of the Desert*, 870 F.2d 1411, 1418 (9th Cir.1988).

---

**4.** Dow identified an article entitled, "Human Adjuvant Disease, Possible Autoimmune Disease After Silicone Implantation: A Review of the Literature." The article appeared in the July, 1986 edition of *Plastic and Reconstructive Surgery*, a periodical published by the American Society of Plastic and Reconstructive Surgeons.

■ When confronted with an offer of expert testimony, the trial judge must first determine, pursuant to Rule 104(a) and Rule 702, whether the expert is proposing to testify to scientific knowledge that will assist the trier of fact in resolving a fact in issue.[5] Dow asserts that the district court erred in not holding a formal hearing. We disagree. The district court is not required to hold a Rule 104(a) hearing, but rather must merely make a determination as to the proposed expert's qualifications.

■ Dow objects to the admission of testimony from Hopkins' three expert witnesses: Drs. Lappe, Kossovsky and Vasey. Dow asserts that Dr. Lappe was not qualified to testify as an expert because he was not qualified to recount a causal connection between Hopkins' implants and the disease from which she suffered. Hopkins contends that although Lappe is not a medical doctor, he is a nationally-renowned toxicologist who has served federal and state agencies as well as private organizations in determining the safety of substances and materials for use by human beings. With respect to Drs. Kossovsky and Vasey, Dow asserts that although they were medical doctors qualified to diagnose the cause of illness, neither was qualified to testify to Hopkins' condition because neither had examined her. We conclude that the knowledge, skill, and experience of Hopkins' three experts was sufficient to qualify them as experts within the meaning of Rule 104(a). The district court's decisions were proper.

Dow further challenges the admissibility of Hopkins' experts' testimony on the basis that the experts' methodology was not based on generally accepted scientific principles. The admission of such expert testimony is controlled by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, —— & n. 11,

113 S.Ct. 2786, 2796 & n. 11, 125 L.Ed.2d 469 (1993). In *Daubert,* the Supreme Court held that the *Frye* "general acceptance" test was superceded by the adoption of the Federal Rules of Evidence. —— U.S. at ——, 113 S.Ct. at 2793. Focusing on the history of Rule 702, the Court stated, "[t]he drafting history makes no mention of *Frye,* and a rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion' testimony.'" *Id.* —— U.S. at ——, 113 S.Ct. at 2794 (citing *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 169, 109 S.Ct. 439, 449, 102 L.Ed.2d 445 (1988)). In formulating an approach to Rule 702, the Court noted that the trial judge must ensure that any scientific testimony or evidence ultimately admitted is "not only relevant, but reliable." *Id.* —— U.S. at ——, 113 S.Ct. at 2795. The Court stated that the expert's testimony must be based on "scientific ... knowledge," implying a "grounding in the methods and procedures of science" and must connote "more than subjective belief or unsupported speculation." *Id.* The inquiry is to be a flexible one, and "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* —— U.S. at ——, 113 S.Ct. at 2797.

■ Thus, according to *Daubert* and Rule 702, the testimony of these experts need not be based on "generally accepted" methodologies, but rather must be based on "scientific knowledge" that will "assist the trier of fact." *Id.* —— U.S. at ——, ——, 113 S.Ct. at 2794, 2795; Fed.R.Evid. 702. The record reflects that Hopkins' experts based their opinions on the types of scientific data and utilized the types of scientific techniques relied upon by medical experts in making determinations regarding toxic causation where there is no solid body of epidemiological data to review. The record demonstrates

---

5. Federal Rule of Evidence 104(a) provides:
   (a) Preliminary Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination, it is not bound by the rules of evidence except those with respect to privileges.

Federal Rule of Evidence 702 provides:
   If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

that Dr. Lappe is a recognized expert on the immunological effects of silicone in the human body. Specifically, Dr. Lappe testified that his opinion was based on his experience as a toxicologist, his review of medical records and Dow studies, and his general scientific knowledge of silicone's ability to cause immune disorders as established by animal studies and biophysical data.

Another of Hopkins' experts, Dr. Kossovsky, testified that the methodology used by Hopkins' experts in reaching their conclusions dated back to 1976. Specifically, he testified that his opinion was based on scientific studies he authored, his participation in a preliminary epidemiological study involving over 200 women, and his examination of Hopkins during which he discovered evidence of silicone in her tissue and detected symptoms consistent with exposure to silicone. He also testified to the presence of corroborating evidence found in studies conducted on animals.

Dr. Vasey, a rheumatologist, testified that his opinion was based on medical records, his clinical experience, preliminary results of an epidemiological study and medical literature. Thus, we conclude the "reasoning or methodology underlying the testimony is scientifically valid...." *Daubert,* —— U.S. at ——, 113 S.Ct. at 2796.

We conclude that Hopkins' experts' opinions were based on scientific techniques that satisfied the requirements established in *Daubert.* Accordingly, the district court's decision to admit the expert testimony was not an abuse of discretion.

## IV. *STRICT LIABILITY*

■ Dow asserts that the district court erred in denying its motion in limine regarding the exemption from strict liability on the basis of comment k of the Restatement of Torts and the line of California cases which have followed its reasoning. Hopkins maintains that the exemption from strict liability provided by comment k has no applicability to the facts of this case. We agree with Hopkins that the claimed exception for manufacturers of prescription drugs is unavailable to Dow.

Comment k provides as follows:

k. *Unavoidably unsafe product.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs.... Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability....

In *Brown v. Superior Court,* 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988), the California Supreme Court adopted this approach in exempting the manufacturers of prescription drugs from strict liability for injuries caused by their products. Earlier California cases which addressed the applicability of comment k to prescription drug cases have required that the drug at issue be found to be "unavoidably dangerous." The *Brown* decision, however, disavowed this requirement and concluded that the comment k exception was intended to apply to all prescription drugs, not merely those which have been found to be "unavoidably dangerous." *Id.* 245 Cal.Rptr. at 423, 751 P.2d at 482. In reaching this conclusion, the *Brown* court articulated numerous policy justifications for exempting such manufacturers from strict liability, particularly the importance of developing pharmaceutical products designed to alleviate pain and suffering. In light of these overriding public policy concerns, the *Brown* court concluded that "a manufacturer is not

strictly liable for injuries caused by a prescription drug so long as the drug was properly prepared and accompanied by warnings of its dangerous propensities that were either known or reasonably scientifically knowable at the time of distribution." *Id.* 245 Cal. Rptr. at 424, 751 P.2d at 482–83.

Dow contends that under California law the exception for prescription drugs extends to the implants placed in Hopkins' body. It relies on a California Court of Appeal case that extends this exception to implanted medical devices. *Hufft v. Horowitz*, 4 Cal. App. 4th 8, 5 Cal.Rptr.2d 377 (Ct.App.1992). We need not consider whether this extension of the exception would be adopted by the California Supreme Court because we conclude the exception is inapplicable to the facts of this case.

In the present case, the jury returned special verdicts, finding (1) that the mammary implant was defectively designed, (2) that it was defectively manufactured, and (3) that Dow failed to warn of a known or knowable risk of harm of the type the plaintiff alleged occurred to her. These findings were adequately supported by substantial evidence. Because of these jury findings, it is clear that the requirements for the exemption to strict liability announced in *Brown* for prescription drugs were not met. There was a failure to establish that the product was properly prepared or that the appropriate warnings were given. Thus, even if this prescription drug exemption were extended to implanted medical devices, the exemption would be inapplicable because the essential conditions of the special exemption were not met.

Because there was adequate evidence to sustain the jury's finding of liability on the basis of strict liability, we need not consider the other theories of liability.

## V. THE DAMAGE AWARD

Hopkins was awarded $840,000 in compensatory damages and $6.5 million in punitive damages. Dow challenges the size of these awards. Dow contends that the compensatory damage award vastly exceeds actual damages sustained and further contends that the

punitive damages award cannot be sustained because it is "grossly excessive," and no understandable relationship exists between actual damages and punitive damages. Hopkins asserts that the record contains ample evidence to support the amount of both the compensatory and the punitive damages awards.

### A. *Compensatory Damages*

■ The record indicates that expert testimony presented at trial supported a finding that plaintiff had lost $404,083 in earnings as a result of her autoimmune disease. Her past medical bills were stipulated to be $37,-318, and her future medical bills were computed to a present value of $31,600. Therefore, Hopkins' out-of-pocket losses amounted to $473,001. In addition, the jury apparently awarded Hopkins $366,999 in damages for "severe shock to the mental system" and mental pain. Other than a generalized allegation that Hopkins could not have suffered this degree of loss based on her claims, Dow offers no evidence to support its contention that the damages award was excessive. We conclude that the award of compensatory damages was proper.

### B. *Punitive Damages*

"In reviewing an award of punitive damages, the role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered. The court of appeals should then review the district court's determination under an abuse-of-discretion standard." *Browning–Ferris Indus. v. Kelco Disposal, Inc.*, 492 U.S. 257, 279, 109 S.Ct. 2909, 2922, 106 L.Ed.2d 219 (1989); *see also Bouman v. Block*, 940 F.2d 1211, 1234 (9th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991) (trial court has discretion to award punitive damages); *Kennedy v. Los Angeles Police Dept.*, 901 F.2d 702, 707 n. 3 (9th Cir.1989) (jury has considerable discretion to award punitive damages, and its award, if supportable, will not be lightly disturbed).

The Supreme Court stated that the following considerations are relevant to a determination of whether a punitive damages award is excessive or inadequate:

(a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the "financial position" of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation.

*Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21–22, 111 S.Ct. 1032, 1045–1046, 113 L.Ed.2d 1 (1991). Application of these standards in *Haslip* imposed a sufficiently definite and meaningful constraint on the discretion of fact-finders in awarding punitive damages. *Id.*

The Supreme Court recently provided additional guidance on the issue of excessiveness of punitive damage awards in *TXO Production Corp. v. Alliance Resources Corp.*, —— U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (plurality). In upholding a judgment of $19,000 in actual damages and $10 million in punitive damages, the Court opined that punitive damages awards are "the product of numerous, and sometimes intangible, factors; a jury imposing a punitive damages award must make a qualitative assessment based on a host of facts and circumstances unique to the particular case before it." *Id.* —— U.S. at ——, 113 S.Ct. at 2720. The Supreme Court identified various principles that may be considered when reviewing a punitive damages award. For instance, a court is not limited to considering the proportionality of the punitive award to actual damages sustained, but may also consider the magnitude of the harm that potentially could have occurred and the potential gain to the defendant. The Court noted that punitive damages had been awarded by an impartial jury, as a result of collective deliberations based on arguments of adversaries and evidence, and then reviewed by the trial judge and upheld by the unanimous decision of the State Supreme Court of Appeals, "is entitled to a strong presumption of validity." *Id.* —— U.S. at —— – ——, 113 S.Ct. at 2719–20. Under these circumstances, the judgment of the Court declined to adopt a bright line test for evaluating the constitutionality of punitive damages awards and reiterated its position in *Haslip* that a "general concer[n] of reasonableness ... properly enter[s] into the constitutional calculus." *Id.* —— U.S. at ——, 113 S.Ct. at 2720 (citing *Haslip*, 499 U.S. at 18, 111 S.Ct. at 1043). The Court indicated that while proportionality to actual damages sustained is relevant in the analysis, it is only one of several factors to be considered. *Id.* —— U.S. at ——, 113 S.Ct. at 2722.

The evidence presented at trial established that a large number of Dow silicone gel breast implants had been implanted in thousands of women. Each of these women was at risk of encountering the same fate from which Hopkins suffered. Therefore, Dow's conduct in exposing thousands of women to a painful and debilitating disease, and the evidence that Dow gained financially from its conduct, may properly be considered in imposing an award of punitive damages. Moreover, given the facts that Dow was aware of possible defects in its implants, that Dow knew long-term studies of the implants' safety were needed, that Dow concealed this information as well as the negative results of the few short-term laboratory tests performed, and that Dow continued for several years to market its implants as safe despite this knowledge, a substantial punitive damages award is justified. Coupled with the facts that Dow is a wealthy corporation and that Dow made a considerable amount of money from the sale of its implants, the jury's award of $6.5 million is reasonable in light of *TXO* and *Haslip*. Therefore, we conclude that Hopkins presented sufficient

evidence to uphold the jury's findings with respect to the punitive damages award.

## VI. CONCLUSION

We conclude that the district court properly granted Hopkins' motion for summary judgment on the statute of limitations question. We further conclude that the district court properly admitted expert testimony regarding the cause of plaintiff's injuries and the award of damages is therefore upheld.

**AFFIRMED.**