Kathy CARTWRIGHT et al., Plaintiffs,

v.

**HOME DEPOT U.S.A., INC. et al., Defendants.**

No. 94–887–CIV–ORL–19.

United States District Court, M.D. Florida, Orlando Division.

July 23, 1996.

Linda L. Schwichtenberg, Crews & Bodiford, P.A., Orlando, FL, Thomas M. Burke, Cabaniss & Burke, P.A., Orlando, FL, Nolan Carter, Law Office of Nolan Carter, Orlando, FL, for plaintiffs.

Kenneth Lewis Bednar, Arnstein & Lehr, West Palm Beach, FL, for Home Depot U.S.A., Inc., Sherwin–Williams Co.

A. Craig Cameron, Cameron, Marriott, Walsh, Hodges & D'Assaro, P.A., Orlando, FL, for Wal–Mart Stores, Inc., United Coatings, Inc.

Francis H. Sheppard, Rumberger, Kirk & Caldwell, P.A., Orlando, FL, for Process Corporation.

## ORDER

BAKER, United States Magistrate Judge.

This cause came on for consideration after evidentiary hearing on the following motion filed herein:

**MOTION: MOTION IN LIMINE TO BAR OPINION TESTIMONY OF ROY T. MCKAY AND STUART M. BROOKS**

**FILED: MAY 10, 1996 (Doc. No. 178)**

**THEREON** it is **ORDERED** that the motion is **GRANTED.**

Two of Plaintiffs' expert witnesses have offered opinions that the Defendants' latex paint caused asthma complained of by Plaintiffs. The issue presented by Defendants' motion is whether the opinions meet the standard for scientific evidence set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). After referral of this matter to the United States Magistrate Judge, an evidentiary hearing was conducted over three days. Pursuant to 28 U.S.C. § 636(b)(1)(A) and subject to Rule 72(a), F.R.Civ.P., the motion to exclude the testimony is **GRANTED.**

## BACKGROUND

In April 1991 Plaintiff Kathy Cartwright embarked on a series of major painting projects around her house, using various colors and brands of latex paint manufactured or sold by the Defendants. Sometime thereafter she began suffering from nasal and respiratory distress. She and her adopted daughter Nicole, also a plaintiff, were later diagnosed with asthma. They[1] filed suit against the defendant paint manufacturers claiming that the latex paints caused their asthma. The Amended Complaint alleges tortious failure to warn that latex paint may result in asthma. In addition to other defenses, the Defendants deny that latex paint in general can cause asthma or that their paints in particular caused asthma in Plaintiffs.[2]

■ In support of their claim, Plaintiffs have offered opinion testimony from Dr. Roy T. McKay, a Ph.D. toxicologist, and Dr. Stuart M. Brooks, a medical doctor specializing in respiratory diseases including asthma. These expert witnesses[3] submitted reports and testimony concluding that the latex paints used by Kathy Cartwright caused asthma in the Plaintiffs.

## EVIDENTIARY FRAMEWORK

The leading Eleventh Circuit case applying the dictates of *Daubert* is *Joiner v. General Electric Co.,* 78 F.3d 524, 529–30 (1996). The court provided the following guidance:

In 1993, the Supreme Court in *Daubert,* 509 U.S. at 585, 113 S.Ct. at 2793, specifically held that the Rules superseded the Frye "general acceptance" test. The Court made clear that the critical concerns of Rule 702 are evidentiary reliability and relevancy. *Daubert,* 509 U.S. at 589, 113 S.Ct. at 2795. Thus, an expert's bald statement that he or she is imparting "scientific knowledge" does not automatically render that expert's opinion admissible. In order to best ensure relevant and reliable testimony and exclude "unsupported speculation," Daubert establishes a two-pronged test which requires a district court, before it may admit scientific testimony, to determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. at 2796. This "gatekeeping" role calls for the trial judge to make a "preliminary assessment of wheth-

1. Kathy Cartwright's husband Mark is also named as a plaintiff, however, he has filed a motion for voluntary dismissal (Doc. No. 168).

2. Defendants dispute whether Plaintiffs actually have asthma. There is, however, ample evidence to support the conclusion, leaving this an issue to be resolved by the jury.

3. Defendants cast aspersions on the backgrounds of the witnesses because they are academics who testify with some frequency. Those characteristics, while admissible, go primarily to the weight of the expert testimony and have little to do with determining the question under *Daubert.* The witnesses plainly possess credentials qualifying them to offer opinions. The sufficiency of the bases and foundations for those opinions is the issue to be decided at this stage of the case.

er the reasoning or methodology underlying the testimony is scientifically valid, i.e., whether it is reliable; and whether that reasoning or methodology properly can be applied to the facts in issue," i.e., whether it is relevant to the issue involved. *Id.* Proffered scientific evidence must satisfy both prongs to be admissible.

Under the first prong, evidentiary reliability, the district court must examine the reasoning or methodology underlying the expert opinion to determine whether it utilizes valid scientific methods and procedures. Trial judges must evaluate scientific processes and studies with which they may not be intimately familiar, but be careful not to cross the line between deciding whether the expert's testimony is based on "scientifically valid principles" and deciding upon the correctness of the expert's conclusions. The latter inquiry is for the jury and, therefore, judges may not implicitly factor it into their assessment of reliability.

Daubert suggests several factors to aid federal judges in evaluating whether a particular scientific theory or study is reliable: (1) its empirical testability; (2) whether the theory or study has been published or subjected to peer review; (3) whether the known or potential rate of error is acceptable; and (4) whether the method is generally accepted in the scientific community. *Id.* at 593–97, 113 S.Ct. at 2797–98. These factors are neither exhaustive nor applicable in every case. See also [*In re*] *Paoli* [*R.R. Yard PCB Litigation*], 35 F.3d [717] at 742 [ (3d Cir.1994) ]. Where appropriate, they serve as indicia of the reliability of the basis of an expert's testimony.

Under the second prong, relevance, the district court must determine whether the methodology or reasoning underlying the expert opinion relates to the issue at hand, i.e., whether it assists the trier of fact in understanding the evidence or a fact in issue. *Daubert,* 509 U.S. at 589, 113 S.Ct. at 2795. In this regard, the Daubert Court discusses the concept of "fitness," that is, "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* at 591,

113 S.Ct. at 2795–96 (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)).

In analyzing the admissibility of expert testimony, it is important for trial courts to keep in mind the separate functions of judge and jury, and the intent of Daubert to loosen the strictures of Frye and make it easier to present legitimate conflicting views of experts for the jury's consideration. Frye required that before an expert could testify, the proffered opinion had to be generally accepted in the pertinent field. The necessity for such broad acceptance as a condition for admissibility was eliminated by Rule 702. The admission of scientific evidence that might not yet be generally accepted in the field, however, is contingent on a trial court's finding that such evidence is indeed scientifically legitimate, and not "junk science" or mere speculation. This gatekeeping role is simply to guard the jury from considering as proof pure speculation presented in the guise of legitimate scientifically-based expert opinion. It is not intended to turn judges into jurors or surrogate scientists. Thus, the gatekeeping responsibility of the trial courts is not to weigh or choose between conflicting scientific opinions, or to analyze and study the science in question in order to reach its own scientific conclusions from the material in the field. Rather, it is to assure that an expert's opinions are based on relevant scientific methods, processes, and data, and not on mere speculation, and that they apply to the facts in issue.

## THE EXPERT OPINIONS AT ISSUE

The toxicologist, Dr. McKay, prepared a report and offered testimony stating the conclusion to a reasonable degree of scientific probability that Defendants' paints caused the Plaintiffs' asthma. His reasoning was based on the following observations. Two genetically unrelated individuals were diagnosed with asthma after prolonged exposure to the paints. He asserts that inhalation of paint can cause respiratory irritation and that the scientific literature documents paint as a cause of asthma.

Dr. McKay's January 16, 1996 report identifies two "plausible" mechanisms of causation: (1) prolonged and repeated exposure to asthma-sensitizing agents from the paint; or (2) irritant-induced rhinitis from paint components leading to development of asthma. His report does not choose between these mechanisms nor does it explain how these plausible mechanisms ripen into scientific probability.

In his testimony Dr. McKay identified a number of chemical compounds from the paints that are known to be respiratory irritants. He stated that he had determined that Plaintiffs' exposure to the paints with these ingredients was sufficient to cause their symptoms. His basis for this assertion is obscure because Dr. McKay was unaware of any information detailing what level, if any, of the irritants he identified would actually be exposed to someone using latex paints. Although he testified that he took dose-exposure issues into "consideration," no scientific aspect of that analysis is evident in his report or opinions.

Dr. McKay admitted that there are no epidemiological or animal studies relating latex paint and asthma. He also stated that little was known about latex paint and asserted that his theory had the "potential" for general acceptance. Dr. McKay did not perform any scientific tests to determine or even estimate what chemicals would be bioavailable from using paint as Plaintiff said she did. He identified evaporation of volatiles, creation of micro droplets and skin contact as routes of exposure but could not state that Plaintiffs were exposed to any particular chemical in any amount.

Dr. McKay also relied on his review of scientific literature to support his conclusion that latex paint causes asthma. However, none of the four reports he cited so states. Dr. McKay did not provide any analysis or estimate of what level of exposure to irritants (generally or specifically) would be necessary to produce the reaction he ascribes to the paints.

The physician, Dr. Brooks, based on a physical examination of Plaintiffs, along with standard diagnostic techniques, concluded that Plaintiffs do suffer from asthma.[4] Dr. Brooks relies on Dr. McKay's opinion to provide a toxicological basis for his own opinion that the paints caused asthma in the Plaintiffs. Dr. Brooks did not employ any diagnostic tools or techniques that could identify the source of the asthma he found in the Plaintiffs.

He assumed there were emissions from the paint that produced irritation sufficient over time to result in asthma in individuals such as the Plaintiffs who are atopic (i.e., highly sensitive). He also alluded to the likelihood that Plaintiffs' pre-existing hyper sensitive conditions were aggravated by the paints.

Dr. Brooks has been recognized for his work describing irritant induced asthma resulting from brief, high level exposure to various substances. In this case he posits a major extension of this hypothesis: that prolonged low level exposure to irritants causes asthma. This new theory has not been the subject of any published peer review papers.[5] Dr. Brooks agreed that there are thousands of professional painters who have greater exposure to latex paint than Plaintiff, but there are no accounts, reports, or case studies relating asthma to use of latex paint[6].

---

**4.** As noted above, Defendants dispute this diagnosis, pointing out that available, more definitive tests could have been, but were not, used. These arguments go to the weight, not the admissibility, of this portion of Dr. Brooks' testimony.

**5.** Apparently, Dr. Brooks has drafted a paper describing these observations, but it has not yet been accepted for publication.

**6.** Dr. Brooks indicated that the *only* reported instance of painters developing hyper reactivity in conjunction with water based paint is a case report involving two painters in Chicago. For several reasons, this isolated example is an unre-

liable basis for the conclusions expressed. First, case reports are no substitute for a scientific study. At best such reports indicate possibilities that help inform productive paths for further research. Second, these painters were using primer with a high concentration of ammonia, not latex paint similar to the paint in this case. Also, unlike Plaintiff, these painters were spraying the primer and were doing so in a closed environment. The hyper reaction to their respiratory systems from this single, high level exposure provides no support for Dr. Brooks' new theory that long term low level exposure to latex paint can cause asthma or his conclusion that it did so here.

Neither expert made any effort to ascertain or even approximate what level of exposure to irritants was created by Plaintiffs' described use of the paints. Likewise, they did not provide any quantification to substantiate in scientific terms what level of exposure would have been sufficient to cause asthma in Plaintiffs or anyone else. Both witnesses emphasized that their understanding of the temporal relationship between use of the paints and appearance of symptoms (*i.e.*, Plaintiffs reported feeling ill after use of the paint began) was an important factor in their conclusions.

The published literature relied on by Dr. McKay and indirectly by Dr. Brooks provide little, if any, support for the opinions expressed. The Schumacher reference (Depo. Ex. 2) is no more than an extract[7] that vaguely concludes that painters have impaired ventilory functions. This statement lacks any detail; it fails to describe the kinds of paints used by the subjects; and it does nothing to tie its conclusion to asthma. The Wieslander article (Depo.Ex. 3) was primarily examining the effects of various paints on the skin and eyes rather than airways. Its observations regarding respiratory effects are tentative and vague. While some emitted chemicals are identified with use of latex paints, no correlation with respiratory distress or asthma is drawn. The Hansen article (Depo.Ex. 6) contains a pertinent discussion of the chemistry and toxicology of waterborne paints. The study showed very low levels of irritants and made no finding that such paints caused chronic respiratory problems. The study noted that some "possibility" of irritation due to combined effects of chemicals could not be excluded, but concluded that "No health hazard (eg brain damage) seems to be present for inhalation of volatile chemicals from waterborne paints."

The final item cited by Dr. McKay at the hearing is the Norbäck article (Depo.Ex. 52). That article details a Swedish study of volatile organic compound emissions from use of waterbased paints. The study provides some measurements of actual airborne concentrations of possible irritants. The study does not, however, reach any conclusions that such concentrations produce health effects.

None of these references provides support for the witnesses' most significant conclusions. The literature does not establish that latex paints create respiratory irritation or that development of asthma is associated with use of latex paints.

## RECENT CASE LAW

A number of cases analogous to this one have applied the dictates of *Daubert*, illuminating the requisites and limits of using toxicology in litigation.

In *Joiner, supra*, the Eleventh Circuit reversed the exclusion of expert opinions that the plaintiff's exposure to certain chemicals caused his lung cancer. The court noted the existence of several studies (not presented to the district court) relied on by the experts that supported the conclusion. The district court's disagreement with the results of those studies was an inappropriate inquiry. Rather, it is the methodology of the reports and their relation to the issues in suit that must be analyzed. Finally, the court of appeals held that jury issues were presented as to the material fact of whether plaintiff was actually exposed to the chemicals. Hence summary judgment based on a finding of no exposure was inappropriate.

Other cases provide further examples of applying toxicology under the Federal Rules of Evidence. In an opinion after remand from the Supreme Court, the Ninth Circuit in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, *cert. denied*, — U.S. —, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995), rejected proffered testimony from an expert who was unable to articulate what recognized methodology he used in arriving at a causation opinion that was unsupported by medical literature.

The Third Circuit, as part of an extensive and multi faceted application of *Daubert*, upheld exclusion of causation testimony where the district court found that the witness was really providing "only a hypothesis which he had yet to attempt to verify or disprove by

---

7. Dr. McKay testified that he did not read the full report represented by the extract.

subjecting it to the rigors of scientific testing." *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 764 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995).

To similar effect, the Seventh Circuit affirmed rejection of proposed causation opinions where the witnesses could not distinguish their opinions from mere subjective belief. *Porter v. Whitehall Laboratories, Inc.,* 9 F.3d 607 (1993). Even experts must show that they used science and not speculation to come to their conclusions.

*Cavallo v. Star Enterprise,* 892 F.Supp. 756 (E.D.Va.1995), involved a claim that various medical complaints were caused by plaintiff's exposure to a nearby spillage of jet fuel. The court excluded opinions from a toxicologist and immunologist, finding that they had failed to explicate what scientific methods they had followed. The toxicologist failed to identify "no effect levels" for the chemicals he identified as causal agents of respiratory sensitization. The literature upon which he relied did not directly support his conclusions. Nor, upon examination, would they support the extrapolation made by the witness. The immunologist's testimony regarding causation was also excluded because he was unaware of the duration and intensity of the exposure and was unable to support his opinion other by relying on the temporal sequence and some effort to eliminate other possible causes.

*Casey v. Ohio Medical Products,* 877 F.Supp. 1380 (N.D.Cal.1995), involved a claim that an anesthesiologist contracted hepatitis due to exposure to halothane fifteen years earlier. The court excluded expert testimony based on medical literature where, as the court found, the literature did not support the stated conclusion. The opinion also discusses the distinction between an epidemiological study and a compilation of case reports. While case reports may provide anecdotal support, they are no substitute for a scientifically designed and conducted inquiry.

*Schmaltz v. Norfolk & Western Ry. Co.,* 878 F.Supp. 1119 (N.D.Ill.1995), involved a plaintiff suffering from respiratory problems allegedly stemming from exposure to herbicides. The court excluded proffered testimony by a treating physician who: was unaware of the level of plaintiff's exposure; knew of no documented cases of atrazine causing RADS; and relied on studies of eye irritation in animals rather than respiratory problems in humans. The second expert's opinion was excluded because it was based principally on temporal congruity and not application of scientific analysis.

## ANALYSIS OF THE EXPERT OPINIONS

■ Although the criteria listed in *Daubert* are neither exhaustive nor definitive, they provide a convenient starting point for characterizing the opinions of Drs. McKay and Brooks. The first point is empirical testability. In this case, the ultimate conclusion that latex paint causes asthma and its various component hypotheses certainly *could* be tested. However, it is conceded that these hypotheses have not been subjected to this kind of scientific scrutiny.

The second issue is peer review publication. In this case, only one link in the chain of purported causation has published support. The literature does conclude that certain irritants can create respiratory problems, resulting in asthma. The other, necessary logical steps in the witnesses' reasoning, however, are unsupported. Plaintiffs cite no authority for the propositions that irritating chemicals in latex paints become bioavailable in relevant amounts, that actual exposure levels from any particular uses of latex paint are high enough to cause any reaction, that prolonged, unspecified low level exposure to irritants can cause asthma, or that latex paints generally (or these paints in particular) cause asthma.

The third *Daubert* factor, known or potential error rate, is inapplicable here because Plaintiffs' theories are vague and untested. Thus no rate of error in identification of victims can be ascertained.

The fourth factor is general acceptance in the scientific community. Here, too, when it comes to the specifics and the ultimate conclusions, Plaintiffs' experts' ideas fail to measure up. The notions that long term, low level irritant exposure is a cause of asthma and that latex paint usage can provide such

exposures are not outlandish or pseudo science. At present, however, they are not generally accepted theories. Before ideas such as these can be useful to a finder of fact in a court of law, they must move beyond the stage of intelligent conjecture. As the Court observed in *Daubert:*

> We recognize that in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes. 509 U.S. at 597, 113 S.Ct. at 2798–99 [footnote omitted].

The Court in *Daubert* recognized that the lack of supporting literature might not be significant in cases where the matter at issue is obscure or of limited interest. "Some propositions, moreover, are too particular, too new, or of too limited interest to be published. But submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." That ground for ignoring the non-acceptance of the experts' theories does not apply here. Latex paints have been widely used commercially and by consumers for years. Atopic individuals comprise a significant percentage of the population. If Dr. McKay's hypothesis were supportable, one would expect wide scale investigation and documented acceptance. Their absence with respect to such a commonly used product is telling.

The additional principles discussed and applied in the other cases above likewise demonstrate that the analyses of Plaintiffs' witnesses are inadmissible. Noticeable by its absence from Dr. McKay's approach is any rigorous or quantitative analysis that is typically central to toxicological conclusions. Comparison of the known or estimated exposure to established reactive dose levels is the cornerstone of toxicology. Decrying the absence of data on either side of the crucial equation, Dr. McKay resorted to intuition and supposition.

The court's observations in *Cavallo, supra,* at p. 766 n. 27 are pertinent in this regard:

> Yet, as noted earlier and as readily conceded by Star, there is no doubt that AvJet, as all chemicals, can be toxic. As Paracelsus taught long ago, toxicity is a function of dose. Thus, the question for causation purposes is: At what levels of exposure do what kinds of harm occur?

Dr. McKay does not ask, much less answer, this vital question.

■ Review of the entirety of Dr. McKay's reports, affidavits, deposition testimony and supporting literature fails to identify what "methodology" he did employ, other than reliance on the sequence of events. None of the standard toxicology methodologies or approaches described in the Federal Judicial Center's *Reference Manual on Scientific Evidence* is apparent in Dr. McKay's work in this case.

> It is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of FED.R.EVID. 702. See, e.g., *Porter v. Whitehall Laboratories, Inc., supra,* 9 F.3d at 611 (expert testimony of two doctors excluded where their opinions were based solely on the temporal relationship between the ingestion of ibuprofen and injury); *Conde v. Velsicol Chemical Corp.,* 804 F.Supp. 972, 1023 (S.D.Ohio 1992), aff'd., 24 F.3d 809 (6th Cir.1994)

*Schmaltz, supra* at 1122. The logical fallacy *post hoc ergo propter hoc* has been recognized for generations. The near exclusive reliance by Plaintiffs' experts on this fallacy further undermines any confidence that their opinions are the result of the scientific method.[8]

---

8. The Court in *Cavallo, supra,* at p. 761, n. 9, observed:

> Of course, scientists, like all human beings, hold certain opinions based on no more than intuition or belief. Because such opinions are

not subject to rigorous scientific validation (through testing, peer review, and the like), they are mere hypotheses that fall short of the evidentiary requirements of Rule 702. Were such untested opinions and beliefs admissible,

 

The cases cites by Plaintiffs do not rescue the testimony of Drs. McKay and Brooks. In *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir.1995), a medical causation opinion was admitted even though it was unsupported by literature references. The doctor's opinion was supported by the patient's treatment history, her medical history, pathological studies and other factors. Plaintiff's experts in this case did not display that kind of approach.

In *Benedi v. McNeil–P.P.C., Inc.*, 66 F.3d 1378 (4th Cir.1995), the court ruled that epidemiological studies were not a necessary component of a causation opinion so long as the method actually used is scientifically sound. In *Benedi* the doctors used analysis of actual tissue samples, blood tests, differential etiology and peer reviewed literature to reach their conclusions. These are standard diagnostic tools that do not require epidemiology for their validity. Plaintiffs in this case cannot point to a similar array of tests and other supporting data.

*Cella v. United States*, 998 F.2d 418 (7th Cir.1993) was decided prior to the Supreme Court's decision in *Daubert*. The court upheld admission of a doctor's identification of a specific cause for the plaintiff's polymyositis which is termed idiopathic in most cases. The witness acknowledged that in many cases the cause of polymyositis could not be identified but relied on specific enzyme tests and analysis of plaintiff's stress to establish the cause of his disease. This was not inconsistent with the published literature. Thus, even if *Cella* is still good law after the change wrought by *Daubert*, it does not mandate admission of the opinions here that lack any testing.

### CONCLUSION

Plaintiffs' claim that they suffer from asthma caused by exposure to latex paints. The conclusionary opinions supporting this contention proffered from their expert witnesses are based on post hoc reasoning, intuition and speculation. The absence of data and

then, contrary to *Daubert*, scientists would be speaking in court without the benefit of science.

scientific principles and the dearth of supporting literature for the opinions deprives them of the reliability necessary for admission in evidence. The motion to exclude the opinions is **GRANTED.**[9]

9. Dr. Brooks' diagnostic opinions, as distinguished from his causation opinions, are not excluded by this order.