**Berlyn Joseph CUEVAS and Barbara Ann Cuevas, Plaintiff,**

**v.**

**E.I. DuPONT DE NEMOURS AND COMPANY, Defendant.**

Civil Action No. 1:95–CV–189RR.

United States District Court,
S.D. Mississippi,
Southern Division.

Jan. 10, 1997.

Alben N. Hopkins, Christopher A. Davis, Hopkins, Crawley, Bagwell, Upshaw & Persons, Gulfport, MS, for plaintiffs.

Alex A. Alston, Alston, Rutherford & Van Slyke, Jackson, MS, for defendant.

## MEMORANDUM ORDER

DAN M. RUSSELL, Jr., District Judge.

This matter is before this Court on Motion of the Defendant, E.I. Du Pont de Nemours and Company (hereinafter "DuPont"), for

Summary Judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure. Defendant asks this Court to dismiss the claims of the plaintiffs.

## I. STATEMENT OF FACTS

On or about April 8, 1994, plaintiffs, Berlyn Joseph Cuevas and Barbara Ann Cuevas, brought this personal injury action against DuPont. The complaint alleged that Mr. Cuevas was exposed to a spray which the Mississippi Department of Transportation (hereinafter "MDOT") was administering to the side of the highway for weed control.

Specifically, plaintiffs alleges that on April 21, 1988, Berlyn Joseph Cuevas, a 36 year old white male (Date of Birth: July 15, 1951), was driving his tractor northbound on Highway 603 in Hancock County, Mississippi. At the same time a MDOT spray truck was traveling southbound on Highway 603 spraying a mixture containing Oust (a herbicide used for killing weeds), a chemical manufactured by DuPont. See Exhibit "A" attached to plaintiffs, response to defendant's Motion for Summary Judgment. Plaintiffs allege that at the instant when the two vehicles were even with each other, the MDOT sprayer truck turned to its right to exit onto Highway 43, spraying Oust in the air in the Mr. Cuevas' direction. Mr. Cuevas was sprayed in the face and upper body with Oust.

Plaintiffs allege that his exposure caused a multitude of medical problems for Mr. Cuevas including neuropathy, pulmonary obstruction and restriction, optic nerve damage and dermatitis.

Prior to marketing Oust, DuPont complied with all of the labeling and testing requirements set forth by the EPA. The EPA specifically approved the testing done by DuPont on Oust and the label supplied with Oust.

The plaintiffs have attempted to connect Mr. Cuevas' injuries with Oust. In this attempt, the plaintiffs have designated a number of Mr. Cuevas' treating physicians as expert witnesses. Some of the treating physicians opine that something happened on April 21, 1988, which altered the medical condition of Mr. Cuevas. (See Exhibit 1 attached to defendant's Motion.) None of the treating physicians are specialists in toxicology. None of the treating physicians have any knowledge about the product Oust, its components, or the toxicological effects which Oust could produce. (Exhibit 1 attached to defendant's Motion.) As medical doctors they all based their opinion on the temporal relationship between the alleged exposure to the spray and the exacerbation of Mr. Cuevas' medical problems.

The plaintiffs have also designated Dr. Richard Parent as an expert in the field of toxicology. Dr. Parent was hired by the plaintiffs to evaluate Oust and the relationship it has with Mr. Cuevas' medical problems. Dr. Parent has opined that "Mr. Cuevas' exposure to Oust on April 21, 1988, had a serious impact on his state of health ..." and that "DuPont has not evaluated adequately either the formulation of Oust or its main ingredient...." (Exhibit 3, report of Dr. Parent, p. 7, attached to defendant's Motion.)

Dr. Parent's opinion is based almost exclusively on the temporal relationship between Mr. Cuevas' exposure and his medical problems. In his report, Dr. Parent states that "[T]he temporal relationship between Mr. Cuevas' multiple health problems and his obvious exposure to Oust is very strong...." (Exhibit 3, Parent report, p. 7). In his deposition, Dr. Parent often reiterated the fact that the temporal relationship was the determining factor in coming to his opinion. (Exhibit 2, Parent depo., pp. 107, 109–10, 120–22). This is supported by the fact that Dr. Parent did not conduct any studies on Oust and could not cite a test or publication that demonstrates that exposure to Oust could cause the types of problems Mr. Cuevas is having. (Exhibit 2, Parent depo., pp. 37–38, 46–48, 78, 100–06). Dr. Parent states in his report "No data of significance is available on the effects of inhaling Oust or Sulfomenturon Methyl." (Exhibit 3, Dr. Parent's report, pp. 6–7). The few tests which Dr. Parent cites in his report are subchronic or chronic oral studies on animals. (Exhibit 3, Dr. Parent's report, pp. 6–7). Any exposure Mr. Cuevas may have encountered was acute inhalation. (Exhibit 2, Parent depo., p. 95).

Dr. Parent also admitted in his deposition that he did not have any idea of the amount of exposure experienced by Mr. Cuevas or the contents of the mixture to which Mr. Cuevas was exposed. (Exhibit 2, Parent depo., pp. 82–88). Dr. Parent's opinion has not been admitted to peer review, and he admitted that he did not know of another scientist who agreed with opinion concerning Oust. (Exhibit 2, Parent depo., p. 106).

## II. CONCLUSIONS OF LAW

### A. *EVIDENCE RELATING TO CAUSATION*

#### 1. Introduction

To succeed in this case plaintiffs must prove, by a preponderance of the evidence, that Oust was defective and caused injury to Mr. Cuevas. *Dixon v. Int'l Harvester Co.,* 754 F.2d 573 (5th Cir.1985); *Powe v. Wagner Electric Sales Corp.,* 589 F.Supp. 657 (S.D.Miss.1984). Defendant submits that the plaintiffs have not provided such proof. Summary judgment is mandatory against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2551–53, 91 L.Ed.2d 265 (1986), (1988). *Washington v. Armstrong World Industries, Inc.,* 839 F.2d 1121 (5th Cir.1988); *Crain v. Cleveland Lodge 1532,* 641 So.2d 1186, 1188 (Miss.1994).

Plaintiffs have set forth the testimony of many of the treating physicians and one toxicologist to prove defective condition and causation. This Court must evaluate these opinions to determine if they are admissible. If they are determined to be inadmissible, they cannot be used in ruling on the Motion for Summary Judgment.

#### 2. The Daubert ruling and following opinions

In determining if the opinion of any of these experts is admissible, the Court is guided by Fed.R.Evid. 702 and the Supreme Court's ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), *on re-*

*mand to,* 43 F.3d 1311, *cert. denied,* —— U.S. ——, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995). In *Daubert,* the Supreme Court set forth a two-step analysis for expert testimony:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Daubert,* 509 U.S. at 592, 113 S.Ct. at 2796.

When determining if the testimony is reliable "scientific knowledge," the Court set forth a non-exhaustive list of factors to be considered: (1) whether the theory or technique (opinion) can or has been tested; (2) whether the theory or technique has been published or subjected to peer review; (3) whether the potential rate of error is acceptable and the existence or maintenance of standards; and (4) whether the theory or technique is generally accepted in the scientific community. *Id.* at 593–97, 113 S.Ct. at 2797–99. See also Bert Black, Francisco Ayala & Carol Saffran–Brinks, *Science and the Law in the Wake of Daubert; A New Search for Scientific Knowledge,* 72 TEX. L. REV. 715 (1994) (canvassing a variety of factors that have been suggested to evaluate an expert's testimony); see also *United States v. Downing,* 753 F.2d 1224, 1238–39 (3rd. Cir.1985); *Daubert v. Merrell Dow Pharmaceuticals Inc.,* 43 F.3d 1311, 1317 (9th Cir.1995) (adding a fifth factor: "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation or whether they have developed their opinions expressly for purposes of testifying").

After determining if the science is reliable, the Court must look to the second prong of the test and determine if the science "fits" the situation at hand. *Id.* at 589, 113 S.Ct. at 2794.

In *Daubert* the plaintiffs' claim that the drug Bendectin used during pregnancy for morning sickness caused birth defects. As the mechanisms by which birth defects occurred were largely unknown determining the cause of birth defects fell into the category of epidemiologists, toxicologists, pharmacologists, and similar persons. Those were the experts whose opinions were at issue in Daubert, and they were classified as "scientists."

Previously, in *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923), the court addressed that in *Frye* the case involved a novel scientific technique—the forerunner to the modern polygraph—in a criminal case and was understood to address the admissibility of novel scientific evidence. Accordingly, *Frye* would not be applicable to the experts and their methodologies as such in *Daubert*, i.e., the epidemiological, toxicological, and biostatistical methods employed by the experts were well established in their respect fields. *Daubert* held that the *Frye* general acceptance test was not adopted by Fed.R.Evid. 702. *Daubert*, at 589, 113 S.Ct. at 2794. Rule 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Thus, while *Frye* only addressed a subset of scientific or technical expert testimony, i.e., that relying on novel scientific techniques, *Daubert* speaks more broadly to all scientific (and perhaps all technical) expert testimony. *See Daubert*, 509 U.S. at 592, n. 11, 113 S.Ct. at 2796, n. 11: "Although the *Frye* decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence."

Also, as set forth in footnote 8, Rule 702 all applies to "technical, or other specialized knowledge." *Daubert*, 509 U.S. at 590, n. 8, 113 S.Ct. at 2795, n. 8; see also generally Linda S. Simard & William G. Young, Daubert's Gatekeeper: The Role of the District Judge in Admitting Expert Testimony, 68 TUL. L. REV. 1457 (1994); Thomas G. Field & Colleen M. Keegan, Daubert's Significance, 4 RISK 283 (1993).

The plaintiffs submit that *"Daubert* only prescribes judicial intervention for expert testimony approaching the outer boundaries of traditional, scientific or technological knowledge." Citing *Lappe v. American Honda Motor Co., Inc.*, 857 F.Supp. 222, 225 (N.D.N.Y.1994). In *Lappe* the court applied a narrow view of *Daubert* and held that in determining the admissibility of an engineering expert's testimony about the positioning of an automobile's foot pedals and the likelihood a driver would mistake the accelerator for the brake constituted a scenario where *Daubert* would have no role in determining the admissibility of such testimony. The *Lappe* court allowed the testimony of the expert engineer on the basis that he was qualified to make the opinion and that his investigation on the subject automobile was extensive. *Lappe* does not lend the plaintiffs any support in their argument.

The plaintiffs also cite the Court to *Cantrell v. G.A.F. Corp.*, 999 F.2d 1007 (6th Cir.1993), in allowing the testimony of the treating physicians on causation. In *Cantrell* the treating physician was allowed to testify on the association between asbestos exposure and laryngeal cancer. However, in said case the court relied on the fact that the doctor "identified recognized sources for his opinion on the association between asbestos exposure and laryngeal cancer." *Cantrell*, 999 F.2d at 1014. In the case *sub judice*, physicians treating Mr. Cuevas have not provided the Court with similar support for their position. Similarly, *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116 (9th Cir.1994), *cert. denied*, 513 U.S. 1082, 115 S.Ct. 734, 130 L.Ed.2d 637 (1995), is also not supportive of plaintiffs' contention. In *Hopkins*, medical doctors were allowed to testify that silicone breast implants caused the plaintiff's ailments. The court applied a *Daubert* type of analysis and permitted the testimony because the physicians relied on medical literature and epidemiological studies to form their opinions. *Hopkins*, 33 F.3d at 1125.

The defendant has cited the Court to *Bailiff v. Manville Forest Products Corp.*, 772 F.Supp. 1578 (S.D.Miss.1991). In *Bailiff*, the plaintiff brought an action against multiple chemical suppliers, alleging that the defendants' products caused the plaintiff's chronic industrial asthma and bronchitis. To prove causation, the plaintiff supplied an affidavit from the plaintiff's treating physician. The affidavit stated that the plaintiff was free of medical problems before the alleged exposure, but after he was exposed he suffered from asthma and bronchitis. *Bailiff*, 772 F.Supp. at 1582. The affidavit stated that since the chemicals the plaintiff was exposed to were known possible respiratory irritants, then the chemicals probably caused the plaintiff's medical condition. *Id.* This is exactly the same logic that Mr. Cuevas' treating physicians use.

The court in *Bailiff* rejected the treating doctors' causation testimony. The court first questioned "whether [the doctor] possesses the necessary qualifications to render an opinion on the issue of a causative link between the product of a defendant and [plaintiff's] medical condition." *Id.* The court continued:

> In this regard, there is nothing in Dr. Allum's affidavit to indicate that he has any skills, training, knowledge, education or experience regarding any of the chemicals manufactured by the defendants (other than that contained in the Material Safety Data Sheets, discussed infra), . . . . There is no indication that [the doctor] possesses any information concerning exposure times or quantities of chemicals involved in [plaintiff's] exposures, or that he has knowledge concerning or has performed any tests that might offer information about any cause and effect relationship between exposure to particular chemicals and [the plaintiff's] diagnosed conditions.

*Id.* The court excluded the doctor's opinion concerning causation and granted defendants' motion for summary judgment. *Id.* at 1584. The only difference between *Bailiff* and this case is the fact that the *Bailiff* doctor had read the Material Safety Data Sheets on the exposed chemicals. None of

Mr. Cuevas' treating physicians knew the chemical or the dosage to which Mr. Cuevas was exposed, nor did they review a Material Safety Data Sheet on the chemical.

In *Porter v. Whitehall Laboratories, Inc.*, 9 F.3d 607 (7th Cir.1993), the Seventh Circuit applied *Daubert* to a case very similar to the one at bar. In *Porter*, the plaintiff provided numerous experts who testified that the ibuprofen taken by the plaintiff caused his medical problems. The Court applied the *Daubert* test and noted that the experts could not point to any studies, records or data on which to base their opinions and that the experts' basis was the temporal relationship between the plaintiff taking the ibuprofen and the medical problems experienced. *Porter*, 9 F.3d at 614. The Court stated that "[I]f experts cannot tie their assessment of data to known scientific conclusions, based on research or studies, then there is no comparison for the jury to evaluate and the experts' testimony is not helpful to the jury." *Id.* at 614. The Court determined that the district court's granting of summary judgment was appropriate because of the inadmissibility of the experts' opinions and the plaintiff's inability to prove causation. *Id.* at 616.

Another illustrative case is *Schmaltz v. Norfolk & Western Ry. Co.*, 878 F.Supp. 1119 (N.D.Ill.1995). In this case, a plaintiff alleged that the spraying of herbicides at his work place caused him to develop Reactive Airway Disfunction Syndrome (RADS). The plaintiff planned to introduce the testimony of two experts who would testify that the spraying of the herbicide caused the plaintiff's RADS. The Court, in applying *Daubert*, observed that the experts' theory could be tested, but pointed out that the opinion had not been tested and that there were no documented cases of this type of exposure causing PADS. *Schmaltz*, 878 F.Supp. at 1122. Also, the Court observed that the experts did not know what concentration of herbicide the plaintiff was exposed to. *Id.* Finally, the Court cited one doctor's testimony that the basis of the opinion was a temporal relationship, and the Court responded, "[I]t is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore

insufficient to satisfy the requirements of Fed.R.Evid. 702." *Id.* citing *Porter,* 9 F.3d t 611.

The Fifth Circuit has also followed this logic in *Wheat v. Pfizer, Inc.,* 31 F.3d 340 (5th Cir.1994). The Court stated "in passing" that the testimony of an expert would be barred when the expert admitted "that no study of the [theory] had ever been done, and thus his opinion lacked an empirical foundation. Neither had it been subjected to peer review and publication which Daubert also identifies as key." *Wheat,* 31 F.3d at 343. *See Cartwright v. Home Depot U.S.A., Inc.,* 936 F.Supp. 900 (M.D.Fla.1996) (ruling expert testimony barred pursuant to Daubert because causation opinion of expert witness was based solely on temporal relationship); *Cavallo v. Star Enterprise,* 892 F.Supp. 756 (E.D.Va.1995) (excluding experts' testimony on causation because temporal relationship is not valid scientific methodology and other tests did not "fit" the situation).

More recently, in *Allen v. Pennsylvania Engineering Corp.,* 102 F.3d 194 (5th Cir. 1996), the United States Court of Appeals for the Fifth Circuit affirmed a district court's granting of a manufacturer's motion for summary judgment on *Daubert* grounds. The district court had held that expert testimony to the effect that exposure to ethylene oxide caused cancer was not scientifically valid under *Daubert* and was properly excluded; and further the district court held that the expert testimony was not based on facts reasonably relied on by experts in the field. In the instant case, Dr. Parent has not related any facts or evidence from his own studies or those of others "in the field" to be reasonably relied upon or otherwise.

### 3. Applying the law to the plaintiffs' experts

■ As stated above, plaintiffs have designated as experts many of Mr. Cuevas' treating physicians. None of the treating physicians testified that they have knowledge about the product Oust, its components, or the toxicological effects which Oust could produce. (Exhibit 1 attached to the defendant's Motion for Summary Judgment). They all based their opinion on the temporal relationship between the alleged exposure to the spray and the exacerbation of Mr. Cuevas' medical problems.

The Mississippi Supreme Court has recognized the flawed logic of *post hoc ergo propter hoc. Western Geophysical Co. v. Martin,* 253 Miss. 14, 174 So.2d 706, 716 (1965); *Kramer Service, Inc. v. Wilkins,* 184 Miss. 483, 186 So. 625, 627 (1939). Simply because one act precedes another does not make the first act cause the second. *See Cather v. Catheter Technology Corp.,* 753 F.Supp. 634 (S.D.Miss.1991) (ruling that mere proof of damage following use of product is not sufficient to establish liability); *Edwards v. Sears, Roebuck and Co.,* 512 F.2d 276 (5th Cir.1975). Pursuant to the law as set forth in *Daubert,* these experts' opinions as to defective condition and causation are inadmissible.

The Court must next review the admissibility of the opinion of the plaintiffs' toxicologist, Dr. Richard A. Parent, under the *Daubert* analysis.

■ First, Dr. Parent's opinion, while having the ability to be tested, has not been tested. Dr. Parent has not conducted any such test on his opinion. (Exhibit 2, Parent depo., pp. 37–38, 46–47, 78). In fact, Dr. Parent states in his report that "[n]o data of significance is available on the effects of inhaling Oust or Sulfometuron Methyl." (Exhibit 3, Dr. Parent's report, pp. 6–7).[1] He also states in his report that "[n]o toxicological data is available to provide insight into the lung as a target organ for Oust." (Exhibit 3, Dr. Parent's report, p. 7).

As well as not being tested, Dr. Parent admits that there are no reports, studies or publications which suggest that Oust is toxic to humans. (Exhibit 2, Parent depo., pp. 47–48, 100–03). It is crucial to remember that Oust is a herbicide which has been on the market since 1983, and there remains no publication of the ill effects of this herbicide

---

1. Dupont disagrees with this assessment, as numerous inhalation studies on animals were conducted and supplied to the plaintiff. All of such tests demonstrate that Oust is a chemical of low toxicity.

on humans or animals. Such a mass-marketed herbicide with dangerous tendencies would have multiple articles and studies published concerning such dangerous tendencies. *See Schmaltz,* 878 F.Supp. at 1123; and *Cartwright,* 936 F.Supp. at 906.

Dr. Parent's opinion fails the second element discussed in *Daubert,* which is peer review. Dr. Parent admits that his opinion has not undergone any type of peer review, and he does not know of any other toxicologist who agrees with his opinion. (Exhibit 2, Parent depo, p. 106). *See Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307 (5th Cir.1989), *cert. denied,* 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990) (ruling that "courts must be skeptical of medical and other scientific evidence that has not been subjected to thorough peer review.")

With these facts, the third element of potential error and the fourth element of general acceptance are not met by Dr. Parent's opinion.

Another element used to test the reliability of scientific opinion is whether the opinion naturally came out of the expert's research. *Daubert v. Merrell Dow Pharmaceuticals Inc.,* 43 F.3d 1311, 1317 (9th Cir.1995);(Exhibit 2, Parent depo., pp. 37–38). Dr. Parent was specifically employed by plaintiffs to state an opinion concerning Oust. (Exhibit 2, Parent depo., p. 33). *See Schmaltz,* 878 F.Supp. at 1121. None of his opinions are an outflow of natural research done prior to being employed by the plaintiffs.

Toxicology also requires a determination of what dose-response relationship exists between the element in question and the harm that has possibly been caused. Dr. Parent has no idea of the mixture or dosage to which Mr. Cuevas was exposed. (Exhibit 2, Parent depo., p. 82). He did not know that the highway department put one ounce of Oust in 25 gallons of water and then added additional surfactants before spraying. (Exhibit 2, Parent depo., p. 82). He was not aware of how the mixture was sprayed or how the mixture could drift to Mr. Cuevas. (Exhibit 2, Parent depo., pp. 83–85). Also, he did not make any determination of how long Mr. Cuevas was exposed to the mixture. (Exhibit 22, Parent depo., p. 85). All of these determinations are an essential element to a valid toxicological opinion determining whether a chemical caused certain reactions. *See Cavallo,* 892 F.Supp. at 764. Many times in his report and in his deposition Dr. Parent acknowledges that his opinion is based on the temporal relationship between the alleged exposure and Mr. Cuevas' medical problems. (Exhibit 2, Parent depo., pp. 107, 109–10, 120–22). In his report he states that "[t]he temporal relationship is very strong . . . ." (Exhibit 3, Parent report, p. 7). In his deposition he was asked whether the exposure to Oust could have caused the medical problems Mr. Cuevas was experiencing, and Dr. Parent replied:

A.  Considering the temporal relationship and the fact that Mr. Cuevas did not have many of these medical problems prior to his exposure and appears with these medical problems after his exposure, I would say yes, there is a connection there. . . .

Q.  All right. And you have said mainly because of the temporal nature of this, because—as I understand what you just said, because of the fact of the exposure and him going to the doctor shortly after that and the finding of the medical doctors in that connection?

A.  And the sequence of events in terms of his medical evaluation that followed, yes, sir.

Exhibit 2, pp. 106–08. He reiterates the importance of the temporal relationship in the deposition when asked his opinion concerning each ailment suffered by Mr. Cuevas. (Exhibit 2, Dr. Parent's report, pp. 119–22).

The Court agrees that this methodology is simply not sufficient to amount to reliable scientific knowledge and fails under *Daubert.* Since the methodology is in error, the testimony is inadmissible. In order to proceed, the plaintiffs must have evidence connecting the alleged exposure to Mr. Cuevas' medical problems; the plaintiffs have failed to produce such sufficient evidence. Contrary to the plaintiffs' contentions, the expert testimony of the treating physicians and the toxicologists are not sufficient or admissible under

Daubert or Rule 702 of the Federal Rules of Evidence.

Accordingly, since the defective condition and causation opinion of the plaintiffs' expert witnesses is inadmissible, the Court must grant the defendant's Motion for Summary Judgment.

## B. PREEMPTION OF PLAINTIFFS' CLAIMS INVOLVING THE LABEL OF OUST BY FIFRA

■ Although the Court is dismissing plaintiffs' claims, it would note that defendant is correct in asking for the granting of partial summary judgment on the plaintiffs' claims regarding the labeling of Oust.

### 1. Overview of FIFRA

The Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) is a comprehensive statute that controls the registration of herbicide products and the content of the labels on those products. Under FIFRA, therefore, the EPA has exclusive authority to determine the sufficiency of the label contents pursuant to specific mandates of the statute. *Clubine v. American Cyanamid Co.*, 534 N.W.2d 385, 387 (Iowa 1995). It is clear in *Taylor AG Indus. v. Pure-Gro*, 54 F.3d 555, 561 (9th Cir.1995), quoting *Papas v. Upjohn Co.*, 985 F.2d 516, 519 (11th Cir.), *cert. denied sub nom Papas v. Zoecon Corp.*, 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993), that the courts do not have the power to determine claims of label or warning inadequacies.

FIFRA is a comprehensive federal statute regulating herbicide use, sales, and labeling. *Taylor*, 54 F.3d at 559. Congress has expressly provided for preemption in section 136v(b) of FIFRA. 7 U.S.C. § 136v(b). Label-based claims are "derived from the assertion of factual matters FIFRA expressly places within the exclusive dominion of the EPA." *Clubine*, 534 N.W.2d at 387.

The EPA found that the Oust label "complied with the requirements of [FIFRA]." 7 U.S.C. § 136a(c)(5)(B). The language of DuPont's label for Oust was specifically approved by EPA.

The plaintiffs have three items in the complaint which relate to the labeling of Oust. In Count I, B and C of paragraph XV question the labeling of Oust. In Count II, B and C of paragraph XXI question the label of Oust, and Count III on breach of warranty concerns the labeling of Oust. Without addressing the issue further, the Court would note that all of these claims as they relate to the Oust label are, therefore, preempted by FIFRA. *Miller v. E.I. Du Pont de Nemours and Co.*, 880 F.Supp. 474, 477–480 (S.D.Miss. 1994); *Bingham v. Terminix Int'l Co.*, 850 F.Supp. 516, 520 (S.D.Miss.1994). *See also Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that the Motion of the defendant, for Summary Judgment is hereby **GRANTED.**

**IT IS FURTHER ORDERED AND ADJUDGED** that all other outstanding motions are hereby **DENIED** as **MOOT.**

**IT IS FURTHER ORDERED AND ADJUDGED** that a Judgment shall be submitted by January 27, 1997, in accordance with the foregoing Memorandum Order pursuant to Rule 58 of the Federal Rules of Civil Procedure and Rule 9 of the Uniform Local Rules of the United States District Courts for the Northern and Southern Districts of Mississippi.